UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

JEAN CLAUDE DELVILLE,

                Plaintiff,

- against -

FIRMENICH INCORPORATED,

                Defendant.

----------------------------------------X

08 Civ. 10891 (JPO)

DECLARATION OF
JEAN CLAUDE DELVILLE

JEAN CLAUDE DELVILLE, under penalty of perjury, affirms and states as follows:

    1.    I am the plaintiff in this action. I submit this declaration in opposition to the Defendant's Motion for Summary Judgment.

    2.    I am 63 years old. I was born on March 28, 1949.

    3.    I am a perfumer. As a perfumer, among other things, I create fragrances. My job requires both an artist's sensibility and scientific knowledge. I try to create a mood, sensation, and emotion with my fragrances by mixing natural and synthetic ingredients.

    4.    I worked at Firmenich Incorporated ("Firmenich") between 1984 and 1986 as a perfumer. In or around 1987, I left Firmenich and began working for another fragrance house, International Flavors and Fragrances, Inc. ("IFF").

    5.    In or around 2000, Patrick Firmenich ("P. Firmenich"), who was then the Vice President of Fine Fragrance Perfumery for North America and is currently the Chief Executive Officer, recruited me to rejoin Firmenich. In part, P. Firmenich recruited me to join Firmenich to gain a competitive advantage over IFF. IFF was a competitor of Firmenich and I had several successful adoptions or wins at IFF.

1

427708 v1

6. In part, P. Firmenich recruited me because P. Firmenich wanted my then-girlfriend and future wife, Mireya Zendejas ("Zendejas"), to join the company. Zendejas is approximately 18 years younger than me. As of 2000, Zendejas also worked for IFF. She had been with IFF for approximately nine and one half years. Zendejas and I both joined Firmenich in or around April 2000.

7. Also, I believe that P. Firmenich recruited me because I had previously worked at Firmenich and had been successful there.

8. As set forth in my affidavit submitted to the Equal Employment Opportunity Commission and my deposition, around the time I turned 55 years old in March 2004, my managers began pressuring me to retire from Firmenich. In response to questions about retirement, I told my managers that I had no plans to do so.

9. Between December 2003 and February 2004, I met with Raymond Collins ("Collins"), who was the Head of Human Resources in North America, on more than one occasion. During these meetings, I complained to Collins about, among other things, unfair treatment to younger perfumers. Also, during those meetings I never told Collins that I intended to retire at 55 or 61 years old, nor did I have plans to retire at 55 or 61 years old.

10. In or around July 2006, I discovered that Firmenich had failed to make certain contributions to a deferred compensation account called the Capital Accumulation Plan ("CAP") account pursuant to my employment agreement. As a result, I had to engage in extensive communications with human resources, the finance department, and counsel for Firmenich. In particular, I called the Firmenich attorney responsible for negotiating my contract. I had two or three conversations with this attorney in July 2006 regarding Firmenich's failure to make contributions to my CAP account. Firmenich's attorney was skeptical that I was owed any

money.

11. During my employment at Firmenich, there were two CAP plans, called CAP I and CAP II. It is my understanding that the entire balance of my CAP II account consisted of contributions that I made, and not supplemental employer contributions.

12. In December 2006, I completed and submitted a Distribution of Benefits Form for my CAP II account. I elected to receive monthly installments over a five-year period. Until my deposition, no one from Firmenich ever asked me questions about my Distribution of Benefits Form for my CAP II account.

13. Beginning in May 2007, my salary and compensation were reduced by 20%. This meant that my salary was decreased almost $100,000.

14. It is my understanding that no other perfumers in the New York office had their compensation or salary reduced during my employment at Firmenich.

15. In an email dated June 27, 2007, I complained of age discrimination to Firmenich management and human resources. In my email, I listed my complaints by letter alphabetically "A" through "M."

16. In statement "J" of the June 27, 2007 email, I wrote, "I should stay home on the weekend and not come to work if I need to." While I cannot recall who said this to me, I wrote this in response to the decision to cut my schedule and criticism that I worked too much. I had no interest in slowing down; I wanted to continue working full-time.

17. I was humiliated by the changes to my schedule and pay. It signaled to others in the industry, including those outside Firmenich, that I was no longer viewed as a top perfumer.

18. On June 29, 2007, I spoke to my manager Jerry Vittoria ("Vittoria").

427708 v1

During the call, I asked Vittoria if he would agree to make changes to my working conditions, including restoring my salary and schedule and addressing my concerns about preferential treatment afforded to younger perfumers. Vittoria said that nothing would change. At the end of our conversation, I told Vittoria that I was resigning my employment from Firmenich. If Vittoria had told me he was willing to make changes to my working conditions and remedy the discriminatory treatment, I would have stayed at Firmenich. I did not want to start over at another company.

19. It is my understanding that after I left Firmenich, some of the fragrances that I had created were adopted by clients. Since leaving Firmenich, I have not received any bonuses, including any bonuses for the fourth quarter of Firmenich's fiscal year 2007 or fiscal year 2008.

20. After I commenced this lawsuit, Firmenich filed counterclaims against me, alleging that I had misappropriated formulas. I believe that the counterclaims, which are not true, cast my professionalism and ethics in a negative light.

21. During my employment at IFF, I created a fragranced called "Happy." Happy is one of the top-ten best selling fragrances of all-time. It is my understanding that of the fine fragrance perfumers who worked in the New York office during my employment at Firmenich, only Harry Fremont and possibly Annie Buzantian, both Master Perfumers, have a top ten all-time fragrance. And, to my knowledge Fremont and Buzantian only have one such fragrance. I regularly review perfume-related publications that provide revenue information concerning top-selling fragrances.

22. There are several categories of fragrance launches, including prestige, masstige, mass, and niche, which relate to how a fragrance is branded, where it is sold and

427708 v1

distributed, and the pricing of the fragrance. It my understanding that prestige launches refer to high-end fragrances that are available on a limited basis at luxury stores and generally have high price points. Masstige launches refer to the downward brand extension of prestige fragrances. Masstige fragrances are sold at more stores and are less expensive than prestige fragrances, and fill the gap between mid-market and premium. In contrast, mass launches refer to those fragrances that are widely distributed and have the lowest price points. Finally, niche launches refer to fragrances whose production is on a small scale and usually available at perfume specialists or high-end fragrance boutiques.

23. Throughout my deposition, I referred to Honorine Blanc ("Blanc") as "Honorine Hattab." It is my understanding that "Hattab" was Blanc's maiden name.

427708 v1

I declare under penalty of perjury that the foregoing is true and correct. Executed on ___April 2nd___, 2012 in New York, New York.

_____
JEAN CLAUDE DELVILLE

6

427708 v1